Jeffrey Faust, attorney for Denise Schmidt. Could you keep your voice up, please? Yes, Your Honor. Thank you very much. I would like to emphasize two points, one of public interest and the other of human interest. The point of public interest relates to a decision that this court made in 1991 in the Finkelstein v. Bergner case, where this court said that disciplinary action discouraging a candidate's bid for elective office represents punishment by the state on the content of a communicative act protected by the First Amendment. The First Amendment issue here is pretty interesting, but there are some other issues that you might have to get over before we could get to that issue. Is that right? I'd be very happy to answer any questions. Well, Judge Walker, there are two orders before us, correct? Yes, Your Honor. The 12b-6 order and the summary judgment order. 12b-6 order and the summary judgment order. Yes, Your Honor. And they were cross motions for summary judgment. Right. But Judge Walker granted a 12b-6, right? Yes, Your Honor. And he left, after that ruling, what he left was he found that the court defendants I have a question about that. But he left the question of whether administrative implementation of the policy retroactively qualified, that there was a basis there to assert, was done so in retaliation for asserted First Amendment rights, correct? Yes, Your Honor. All right. So just taking up a minute for a moment, the legislative immunity issue that he resolved in that 12b-6 ruling, along with a number of other issues, why aren't at least the judges entitled to legislative immunity? Well, there's a number of reasons, Your Honor. First of all, it's not a legislative policy. It's an administrative policy. In the Greater Los Angeles Council for Deafness against Zolin, this Court indicated that internal court policies of this kind are administrative and are not eligible for legislative immunity. That is one reason. You can correct me if I'm wrong, but I'm just trying to sort through what was going on here. Look what happened was that the judges of the now-consolidated Superior Court were and never has been a temporary judge. I'm not saying that she was. I'm just saying, look to me, that what led to all of this was the judges were attempting to put some order, say that loosely, into their temporary judges program, which calls upon lawyers to come and serve as temporary judges for the court, correct?   And what you're correct is that there was a temporary judges rule that was being worked at beforehand and conveniently, somewhat simultaneously with what was going on. I know that, look, I know that you have a number of sinister views about what happened here, and I'm not trying to put that down or anything. I'm just trying to understand how this thing sort of all unfolded. And I can explain that, Your Honor, and it's very clear in the record. In the summer of 2003, there was one judge who was running a committee that had to do with temporary judges. That ended up in a local rule that was put in effect in January of 2004. It was all done by January of 2004 with respect to the obligation of the local court to manage their temporary judges. Denise Schmidt ran against one of the sitting judges in March of 2004. In April of 2004, the next meeting of the judges, they came up with a new policy, which we haven't seen yet, and then kept working on it and working on it and working on it, used it to fire her on May 18th of 2004, but it didn't apply to her by its own terms, so they kept changing it. She was fired. She wasn't fired on the 18th. She was fired on the 19th, right? 19th, pardon me, Your Honor, yes. And hadn't they already adopted the policy? No, Your Honor, the policy has never been lawfully adopted according to the requirements that it be signed off on by the presiding judge, voted on by the executive committee of the court. That had never happened, Your Honor. What happened was one of the judges, Judge Baskin, came out of the April 2004 committee and started writing it up, but the problem was that Denise Schmidt had already applied for the permanent job by May of 2004, and they hadn't got their policy in shape yet. That's why they had to keep changing it and rewriting it to make it fit her because it didn't fit her at the time. Let me ask you this. Now, so Judge Walker looked at your First Amendment complaint and looked at where you allege that they had, they had, I forget which paragraph it is, but you allege that they had adopted this policy. Okay. All right. Now, that's in your complaint. We used the word policy one time in the First Amendment complaint. That's correct, Your Honor. Judge Walker looked at that and he said, this looks like the judges were exercising their authority to implement policies that apply broadly, and that's what it looks like they did. Now, you just made some reference to they didn't adopt it, they, you know, the record is not clear, it was just this one judge. And then later on, Judge Walker has a motion for summary judgment in front of him where he has minutes and notes and all this other stuff about the policy, which we can look at on summary judgment to see exactly kind of what happened here. But why isn't, the way you allege this, why was Judge Walker wrong in just relying on what you alleged? Well, first of all, Your Honor, policy was the word that one of the defendant judges, Maddox, used to Denise Schmidt to explain to her why she wasn't going to be able to fulfill her appointment under the government code of California to which she was duly appointed and wasn't going to be eligible for the permanent courtroom job. She was saying the language that was used to her. We haven't seen the policy. We've asked for it. You say we've done discovery and done summary judgment, but in fact, we didn't get to do the discovery. We went back to try to show the cover-up to say, hey, let's have the minutes and the agendas on this temporary judge canard. You know that it's not the same thing. And may I say, Your Honor, it's very clear under California law that with respect to commissioners, subordinate judicial officers, there is statewide California rules of order that provide uniform qualifications that govern this individual. Temporary judges is different. As Your Honor pointed out, there's an obligation on the local court to manage those individuals, and that was what the rule from 2003 that came in. It's an entirely different animal, Your Honor. It's complete smoke. There are certain minimum standards that are required for somebody to serve as a commissioner. Correct. Right? Yes. Does this preclude a local court, as I read the rules from the Judicial Council, of adopting additional requirements to serve as a commissioner? No, that's wrong, Your Honor. And in fact, the Supreme Court of California. I don't want to argue with you. All right. But there are a lot of rules from the Judicial Council and statutes and whatnot that seem to give the courts a fair amount of discretion in how they go about hiring people as subordinate judicial officers, commissioners, referees, traffic referees, and whatnot. And there is a certain minimum that I think they have to meet, which is they've got to be a lawyer. You've got to be a member of the bar. Right. Well, look, I don't mean to get you – you started off on the constitutional issue. No, this is important, Your Honor. I want to address your concerns. It's a convoluted case because we've never had a fair chance to do discovery or to get to the guts of the case. And the truth is, is that in the Wells Fargo case, the California Supreme Court said there is no authority on the local courts to add on to minimums. That had to do with the summary judgment requirements, as you as a court may recall. The local courts said, well, here's the statewide rule for summary judgment, but for managing our court, we're going to add on. That's just a floor. We're going to add on additional requirements. California Supreme Court in Wells Fargo said no. The statewide rules that say 48 days or whatever it is, it's 48. You don't say that's the minimum. It's like saying minimum voting age. Well, it's 18, but in Contra Costa County, we're going to make it 21. You can't do that. And the California rules of court make it equally clear that you can't do that with respect to the uniform statewide requirements for subordinate judicial officers who are constitutional officers under the California Constitution. They are not temporary judges, Your Honor. You've got to keep that distinction clear. But the public interest is that you can't do that. Well, a subordinate judicial officer can perform the duties of a temporary judge if the parties so stipulate. By stipulation, Your Honor. That's correct. You can do a lot of things by stipulation, but that's not germane to what we're doing here. Well, I didn't mean to. I think Judge Feinberg might want to have a few questions. I have a question about the response of the California bar in 2004. She was ‑‑ she says in her affidavit at paragraph 8, my own inactive status took place after being advised by the state bar that as a subordinate judicial officer, I should be holding inactive bar status. Now, my question is, is she ineligible to hold active bar status? The should there is quite ambiguous. It's ambiguous, but if you read the rest of Denise Schmidt's declaration on that that the bar took the initiative to take her off the active status and actually refunded dues for her. But a bar ‑‑ but a margin might do this as a way of saying, you know, something, you can cut hundreds of dollars a year off of your bar dues by going on inactive status. Why don't we just make this retroactive and save you some money? That would all be permissible, but the question is, did the bar tell her that she could not be an active member of the bar if she was a subordinate judicial officer? I believe in the context, that's a fair reading that they did, Your Honor, because if you read the surrounding declaration, you'll see that Denise Schmidt aversed that the bar took the initiative. And I would say ‑‑ That rule ought to be ‑‑ if that's the rule in California, it ought to be really easy to verify. We have any evidence that other subordinate judicial officers have been forced into inactive status in California. I can't imagine why a bar would demand that judicial officers be placed in inactive status. I understand a lot of bars offer that option. No, Your Honor. In California, none of the judges are ‑‑ I mean, they're in a different status because you have a conflict of interest if you have even the potential to go out there and take money from people to practice law. That's what active status means, the right to take money from people to practice law. All judges are on inactive status. A subordinate judicial officer is a judicial officer, and active status is appropriate. Are judges in California compelled to go on active status? Yes, Your Honor. Yes, Your Honor. And I would say this. You have to read these declarations in light of Rule 56 of the Federal Rules of Civil Procedure. You have to read them in light of what is most favorable to the non‑prevailing party. So you have to take a somewhat charitable and open‑minded view towards that declaration under the rules. Well, so the problem here is you got to keep straight what was alleged in the complaint for purposes of 12B6 and what was provided to the district court on the summary judgment ruling. Well, that's true, Your Honor, but that 12B6 was ‑‑ we were put in a very difficult position. Now, remember, the last appeal, we were up here on both complaints. This Court reversed on both of them, and then when we went back to Judge Walker, he said, pick one. You have to pick one. I said, well, I don't want to do that, Your Honor, because there are things that we've learned since I want to amend. He said, pick one, and that is in the record. Now, what am I going to do? If I don't pick the First Amendment complaint, I have to let the county out of the case. I just give up half the benefit of the appeal, the appeal from the Second Amendment complaint. It was a very, very difficult and unfair situation the plaintiff was put in, Your Honor. There was tremendous hostility against the plaintiff's case in the district court. This court told them, as I said, in our public interest, there's a First Amendment interest. Nobody's been running against these people the last six or seven years. And you had a case in 1991 that said this kind of retaliation violates the First Amendment, but I guess that doesn't apply in Contra Costa County. We have four Superior Court judges, the counsel of the county, the chief executive officer of the court telling people that in this county, you run against one of these judges, you could lose your government job. And that is just wrong, Your Honor. And that should not be the rule. It shouldn't be ambiguous no matter what the Sixth Circuit does. In the nine western states, Guam and the Marianas, the rule should be you can run for office in this free country protected by the First Amendment. That's the public interest. Okay. You've got one minute and 15 seconds left for rebuttal. I'd rather just spend it telling you what the human interest of the story is, and I'll waive the rebuttal. The human interest in this story is Denise Schmidt did nothing wrong. She offered herself for election. She was an appointed commissioner under the government code. There are rules to how to end that appointment. It requires a record by the presiding judge in the court. That didn't happen. It requires minutes of the court. It didn't happen. She was wrongfully terminated as a matter of law under the California government code. As a human being, give her some relief now. Grant some redressment for the plaintiff on that claim only. Let her get started on some of the relief. Don't make her push the rock up the hill for a third time. Okay. Thank you, Your Honor. Thank you for the human aspects of this case. Good morning. I'm Joseph Wiley representing the court defendants. I'll use ten minutes of the time and defer five minutes to Ms. Cooper, who is county counsel for the county. First thing I do want to point out is, as you mentioned, there are two orders before the court. The first is the 12b-6. On the 12b-6, all matters were dismissed except the application of the rule to Ms. Schmidt. It's very narrow. That's the only part that's up on summary judgment where facts matter with respect to it. Everything else is a 12b-6 and it was done on the basis of the pleadings. With respect to the legislative immunity, the pleadings are that there was an explicitly adopted government policy. Well, how do we know? Well, let me ask you this. How do we know that it was, you know, sort of had the trappings of a legislative determination? Well, we know that because she pled explicit governmental policy. Well, this presiding judge could say, this is going to be our policy. Everybody that is, you know, applying for a position as a commissioner has to be a member of the bar five years, at least five continuous years before you're appointed. Well, what we know is that you stick to the complaint. I am going to stick to the complaint. Because that's what Judge Walker did. I understand that. When you look at what she pled and you compare it with the criteria in the county of Maui case, sorry, I can't pronounce the first name in that, but it's the county of Maui case, where the court set the standard for determining whether an act was legislative or administrative, they asked, is it ad hoc or is it policy? In this case, plaintiff pled that it was policy. The next step is, is it a few or is it many that are involved? In this case, the policy applies to every single person who desires to sit as a subordinate judicial officer. How do we know that from the complaint? She pleads it. She says it's the standards. She pleads, it's paragraph 19 or 21. I've forgotten exactly, Your Honor. But it is in the complaint, she pleads, that it's explicitly adopted government policy, and I think it's paragraph 25, that goes on to say, for standards, i.e., qualifications. Counsel, we, in the area of judicial immunity and prosecutorial immunity, for which we have a lot more law than we do in the area of legislative immunity, we have drawn a distinction between administrative decisions and prosecutorial or judicial decisions. Now, most of those involve, when we found them to be administrative, we found them to be individual determinations, you know, firing a court clerk or firing a district attorney, something like that. But we have held sort of an analogous provision, that is, principle in Gutierrez. We said that the promulgation of a rule governing the conduct of clerical employees is best characterized as an administrative function rather than a legislative or judicial one. But what makes this a legislative function rather than an administrative function for the governing of the court? Two things, Your Honor. One is that Gutierrez involved only a small group of courtroom clerks that were presently working for the court. Second, in our case, you have the California Constitution, Article VI, Section 6d, which delegates to the judicial counsel, requiring the counsel to adopt rules for the governance of the trial courts. The judicial counsel at Rule, boy, I've forgotten, it's about 10.9 or something like that, 10.901, delegates that responsibility to the trial court. But the fact that you've got something, the California Constitution or the California statutes, delegates such authority to the courts doesn't tell us whether it's an administrative function or a legislative one. And any more than the California Constitution should say district attorneys should take good care to administer their offices and hire and fire employees as necessary makes the firing of an assistant district attorney subject to prosecutorial immunity. But it's not an act going to an individual or a small group of individuals, Your Honor. It's an act promulgating that says what are the qualifications. A public are going to come into our courtroom. What are the qualifications of the SJO? How many SJOs were affected by this policy in the way that Denise Schmidt was affected? There were four others affected exactly the way she was, a fifth who was disqualified because of prior discipline. Okay. Who were the four? There was another commissioner, temporary commissioner Richard Calhoun, and there were two temporary judges whose names, Your Honor, escape me, but they are in the record. Temporary judges would be a little different. Yeah. Temporary judges are not subordinate judicial officers. The rule applied the same to both. And I thought that Calhoun was in a little different status as well. The only difference with Calhoun is that Judge Maddox did not call Calhoun. But they're the same. They were both. Let me ask you this. So you just provided Judge Bybee an answer with a lot of information. Where's all that in the complaint? What's in the complaint is that it was an express or explicit policy governing the standards. It's not. What you just related to Judge Bybee is not in the complaint. You can discern all that information if you go to the summary judgment when the record has some depth to it. Well, I provided that information to Judge Bybee. He requested. I just wanted to request it. No, but that's all very good. I mean. But the California Constitution, the California rules of court delegating this is you can take notice of that. And Gutierrez is very different, just as Zolan is very different. They both involve a very narrow application as opposed to a broad application. Let me ask you this. Could the presiding judge adopt this policy? I'm sorry? Could the presiding judge of the Contra Costa Superior Court have adopted this policy? No. No. Why not? Well, the testimony, again, that came up during the summary. Now you're going to the summary judgment. If you don't want me to, there is no way of knowing from the complaint whether they could or not. What did she say in the complaint adopted the policy? She says the Court adopted the policy. The defendants, she alleges defendants adopted the policy. And the defendants are four judges and the court executive officer. That's who is alleged to have adopted the policy. I want to take you back to Mr. Calhoun. I'm looking at the pro tem bar membership status of various folks. I'm looking at 338 of the record. Was Mr. Calhoun fired? Mr. Calhoun did not sit again as a temporary commissioner after March of 2004. Wasn't Mr. Calhoun a judge? He was a judge who had been defeated for election 20 years earlier. Okay. But doesn't that put him in a different status? No, it did not. He did not serve again after the promulgation of the rule, the adoption of the rule in April of 2004. I guess what I was really getting at, shouldn't all this have really actually been decided on summary judgment? Well, I don't think so. And related to that, could we, you know, when we get around to the summary judgment ruling, Judge Walker essentially to some extent revisits the whole question of legislative immunity? Well, he does so because he says if you don't want to get to the question of whether candidacy alone is under the Pickering test speech of a matter of public concern, you don't have to because the entire case is promulgation. This case really isn't about application. It's about promulgation. And, Your Honor, the reason why you litigate a legislative immunity case on a 12B6 is because the discovery is terribly invasive with respect to it, and there's a policy. When you read Bogan, and Bogan's a city council case from, I think, Baltimore, and the adoption of an ordinance where one person gets fired as a result of the adoption of the ordinance, there's a public policy to not chill debate, consideration, and discussion. And so legislative immunity cases are often decided with respect to 12B6 because otherwise you get into discovery and the scope of discovery is pervasive and gets into areas where for matters of public policy the court has said you don't have to go. And I would also, one thing I would add with respect to how many people are impacted with it, when you look at Kucinich, Kucinich versus County of Santa Clara, there were only two parcels of land that were immediately impacted in that case with the legislative action. Two parcels of land. And what was the legislative action? It was an action by the County Board of Supervisors. What did they do? They passed an ordinance limiting adult entertainment. But the test with respect to how many, who, how big the class has to be, that was only two. It's pretty obvious that in that circumstance, about what the nature of the legislative action was. Well, it's an ordinance. Yeah. Yeah. I mean, this didn't get promulgated into a court rule, did it? Not a local rule of the court that's published. So it's not a court rule. So it's some other thing. It is. That you contend is the result of, quote, unquote, a legislative kind of determination. It is the result of a delegation under the California Constitution. No, well, that's no, that's different. Because you could, because the Constitution, what you're claiming is legislative immunity, this sort of a, this other kind of immunity that's given to, to policy makers that are adopting a policy that's going to apply broadly using their authority. Well, I believe that this is pledged in that way it's pledged and it's explicit. Let me ask you, let me, so let me just ask you, I have one, I just want to try and better understand the record. Let me, let me ask you a question about the summary judgment. What, how do we know which version of the policy was actually applied to Schmidt? Judge Baskin's testimony is clear and unequivocal that the policy was adopted on April 21st. That's attached to his declaration. The policy was revised. There were several additions, drafts. So the, so the version adopted on April 21st was the, it was adopted by the court. That didn't apply to commissioners. Right. She wouldn't have been fired under that one. That is what the, that was the policy that applied. She was an acting commissioner.  So it only applied to temporary judges, I thought. But the court applied it to all persons who were in a temporary or acting capacity other than a judge. So temporary judges and temporary commissioners. Your documents look like the first policy applied to temporary judges and then in May it was amended to apply to temporary commissioners and that on the 19th of May that, that's what the documents look like. And she was, she was terminated. I'm sorry. She was terminated and then she called on the 19th and on the 20th the phone call was returned. She was told she was terminated under the policy and the policy was read to her. Correct. Is what the documents. And the policy was later amended. There were several drafts of it and there was an amendment that was effective July 1st. I, well, you, you confused me. I'm sorry for that. Yeah, you did. So now you're going to have to help me out. I've looked at all these documents and I've tried to understand exactly. I thought it was the main, the May, the version adopted in. Immediately prior to her termination, Your Honor. I'm sorry. The one, the one that was amended and then they, they said it's going to be retro, it's going to be amended and the amendments will be effective retroactively to May 15th. I, I don't believe so, Your Honor. That's not, that's not it? The policy was effective. Five years active bar membership never changes. That's the same in every single version. Right. But what was changed between April and May was the inclusion of the languages talking about receiving each day of service. That would not have impacted her. Oh, sure it would have. I don't believe. Well, of course it would. She had been, she had been a member for five years prior to her appointment. But she couldn't, she couldn't demonstrate that she had been a member for five years on each day of her service. I'm sorry. I'm sorry. Yes, you are correct, Your Honor. Okay. So the April policy doesn't, doesn't seem to work. Under the April policy, she doesn't get fired. Under the May policy, she gets fired. So between April and May, they have amended the policy in a very unusual way. A rather strange requirement in my book. And all of a sudden, she's, it looks like she's the only one who's, who's going to get fired here. She is not. There were others who were. Calhoun didn't get fired. Well. And he was also a little different because he was a, he was previously a judge. The only difference is that Calhoun was not called. He never served again. He never attempted to serve again. Because he just, he just took himself out of the pool. I don't know. He didn't serve again. He didn't attempt to serve again, at least according to his declaration. But that also indicates then that he wasn't fired. There was no active attempt to fire him. He simply didn't serve again. He didn't get a call on May, on May 19th or May 18th. He did not. The only reason she got a call was because she called and asked. Otherwise, she wouldn't have gotten a call. It would have just been when she, she wouldn't have been called back to serve again as an acting commissioner. Okay. I'll give your colleague there a few moments. Good morning, your honors. May it please the court, Monica Cooper for the county. Although straightforward, it bears emphasis that the county is a complete separate entity than the Superior Court. The issues that you just heard on the Superior Court are completely separate than the issue here with the county. The alleged constitutional violation here is the application of a Superior Court policy to Denise Schmidt to terminate her employment with the Superior Court. Nothing to do with the county. Undisputed that the only policy at issue is a Superior Court policy. It is undisputed that Denise Schmidt was an employee of the Superior Court and not the county. The case against the county is a simple issue under Monell and its progeny. There is no respondee at Superior. The only person involved from Contra Costa County was a deputy county counsel who, after the promulgation, after the adoption of the policy, and after the application of the policy to Ms. Schmidt, she only became involved after all that happened in order to provide legal advice to the Superior Court and to provide edits on a policy that was already in existence. There was no nefarious plot here. This is not, there is no evidence that Ms. Mason did anything unconstitutional. Ms. Schmidt can't establish liability under the Gillette v. Delmore because there's no county policy, there was no county final policy maker at the table, and no county final policy maker ratified any decision. Ms. Mason was assigned to represent the Superior Court by statute after the court consolidation, after the state took control over the courts. She was, it was done by statute and later by MOU. The wild speculations about why Ms. Mason was at the table and what she was doing, what she was saying, what edits she was making, there's no evidence at all in the record of the allegations made by Ms. Schmidt as to Ms. Mason and then attempted to be put on the county. So as suggested in the pleadings, there was no nefarious plot. There is absolutely no evidence of one. This is a fight between Ms. Schmidt and her employer at the time. The county should not be dragged in any longer and the county respectfully requests that the order granting summary judgment be upheld. Thank you. Thank you. Thank you, counsel. We appreciate the arguments on both sides. The matter is submitted.
judges: Vance, Paez, Bybee